IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 2 0 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| MAQUILAPLEX LLC and<br>TEXION S. DE R.L. DE C.V. | *<br>*<br>* |
| VS. | * CIVIL ACTION NO. B-02-212 |
| | * |
| INTERNATIONAL MARKETING<br>RESOURCES, INC. | *<br>* |

### DEFENDANT INTERNATIONAL MARKETING RESOURCES, INC.'S ORIGINAL ANSWER, JURY DEMAND, AND COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW INTERNATIONAL MARKETING RESOURCES, INC., Defendant in the above entitled and numbered cause, and files this its Original Answer, Jury Demand, and Counterclaim in response to Plaintiffs' Original Petition, and in support thereof, would show the Court as follows:

### ANSWER

1.      The statement contained in Paragraph I of Plaintiffs' Original Petition is moot as applied to federal court and, therefore, does not require either an admission or denial.

2.      Defendant admits that, upon information and belief, Plaintiff Maquilaplex LLC is a Texas limited liability company that is in the business of performing contract industrial sewing services. Defendant states that it is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations contained in sub-paragraphs 1 and 2 of Paragraph II of Plaintiffs' Original Petition, and therefore, denies same.

3.      Defendant admits that it is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Defendant further admits that it is in the business of performing out-sourced contract sewing services for marketers and

manufacturers. Defendant admits that it has engaged in business in Texas, although it denies that it "maintains a regular place of business in Texas" or that it "committed a tort in whole or in part in Texas". Defendant admits that it does not have a registered agent for service in Texas, and that service is proper through the Secretary of State under state rules. All remaining allegations contained in sub-paragraphs 3, 4, and 5 of Paragraph II of Plaintiffs' Original Petition are denied.

4.   Defendant admits that it entered into a contract with Plaintiff Maquilaplex, LLC and that Plaintiffs' alleged claims and Defendant's counterclaim against Plaintiffs arise out of this contract. Defendant denies that it breached that contract and further denies that any alleged breach occurred in Cameron County, Texas. Defendant further denies that venue of this action is proper in Cameron County, Texas. All remaining allegations contained in sub-paragraphs 6, 7, and 8 of Paragraph II of Plaintiffs' Original Petition are denied.

5.   Defendant admits that in 2001 the principal owner of Maquilaplex, LLC, which had recently been formed, approached it about securing sewing jobs from Defendant. Defendant further admits that in the fall of 2001, it entered into a contract to sew bags for a new client. Defendant further admits that, based on Plaintiffs' representations that it could produce sufficient quantity and quality of bags to meet the needs of this new client and that it had sufficient financial backing to meet its operation and labor expenses, Defendant entered into a contract with Plaintiff Maquilaplex to produce the bags. Defendant admits that pursuant to the contract terms Plaintiff Maquilaplex agreed to sew bags for this client for payment of a predetermined price by Defendant. Defendant denies that Plaintiff Maquilaplex performed the services or produced the goods that it had contracted with Defendant to produce. Defendant admits that because of Maquilaplex's failure to perform and to produce sufficient quality products pursuant to the contract, Defendant's new client terminated the contract and

all future business dealings with Defendant. All remaining allegations contained in Paragraph III of Plaintiffs' Original Petition are denied.

6. Defendant denies all allegations contained in sub-paragraph A of Paragraph IV of Plaintiffs' Original Petition. Defendant further specifically states that each item of Plaintiffs' sworn account is not just or true.

7. Defendant denies all allegations contained in sub-paragraph B of Paragraph IV of Plaintiffs' Original Petition.

8. Defendant denies all allegations contained in sub-paragraph C of Paragraph IV of Plaintiffs' Original Petition.

9. Defendant denies all allegations contained in sub-paragraph D of Paragraph IV of Plaintiffs' Original Petition.

10. Defendant denies all allegations contained in Paragraph V of Plaintiffs' Original Petition.

11. Defendant denies all allegations contained in Paragraph VI of Plaintiffs' Original Petition.

12. Defendant denies all allegations contained in Paragraph VII of Plaintiffs' Original Petition.

13. Defendant denies that Plaintiffs are entitled to a judgment, damages, exemplary damages, prejudgment interest, postjudgment interest, costs, attorney's fees, or any other relief prayed for in the prayer of Plaintiffs' Original Petition.

14. Defendant denies each and every allegation contained in Plaintiffs' Original Petition not specifically admitted herein.

## AFFIRMATIVE DEFENSES

15. For further answer, if such be necessary, and pleading in the alternative, Defendant further affirmatively alleges that Plaintiffs' claims are barred, in whole or in

part, because Plaintiffs failed to mitigate the effect of their alleged injuries and damages as required by law.

16. For further answer, if such be necessary, and pleading in the alternative, Defendant further specifically denies that it is liable for prejudgment interest in this cause of action as pled by Plaintiffs.

17. For further answer, if such be necessary, and pleading in the alternative, Defendant further specifically pleads the limitation of recovery of exemplary damages as set forth in Section 41.008, et seq. of the Texas Civil Practice & Remedies Code.

18. For further answer, if such be necessary, and pleading in the alternative, Defendant further affirmatively denies that it is liable for exemplary damages and pleads affirmatively the provisions of Chapter 41, of the Texas Civil Practices & Remedies Code, including the provisions on applicability, standards for recovery, preclusions, prejudgment interest, and limitations on amount.

19. For further answer, if such be necessary, and pleading in the alternative, Defendant further affirmatively states that an award of punitive damages in this case would violate the procedural due process guaranteed by the Constitution of the United States. Texas Law, and the instructions given to the jury, are vague and standardless as to whether and how much to punish a defendant, and are likely to produce arbitrary and capricious results. Therefore, any award of punitive damages should be disallowed, or declared null and void.

20. For further answer, if such be necessary, and pleading in the alternative, Defendant further affirmatively alleges that Plaintiffs are not entitled to exemplary or punitive damages as alleged, for the reason that exemplary damages are unconstitutional and violative of the provisions of the United States Constitution and the Texas Constitution, including but not limited to the following provisions:

    (a)    <u>Proscription on excessive fines</u>. U. S. Constitution Amendment 8; Texas Constitution Article I, Section 13.

    (b)    <u>Requirements of Due Process</u>. U. S. Constitution Amendments 5 and 14; Texas Constitution Article I, Sections 13 and 19.

    (c)    <u>Requirement of Equal Protection Under the Law</u>. U. S. Constitution Amendments 5 and 14; Texas Constitution Article I, Sections 3 and 3a.

    (d)    <u>Proscription on Ex Post Facto and Retroactive Law</u>. U. S. Constitution Article I, Section 10; Texas Constitution Article I, Section 16.

    (e)    Such punitive damages are penal in nature. Under Texas law, they are not tied to any fair, just, and reasonable relation to actual damages. Consequently, exemplary damages violate the contract clause of the U. S. Constitution, U. S. Constitution Article I, Section 10.

21.    Defendant reserves the right to raise such additional defenses as may become available through investigation and discovery.

## JURY DEMAND

22.    Defendant hereby requests a trial by jury.

## COUNTERCLAIM

COMES NOW INTERNATIONAL MARKETING RESOURCES, INC., Defendant in the above entitled and numbered cause, and now acting as Counter-Plaintiff (hereinafter referred to as "IMR"), files this its Counterclaim, complaining of Maquilaplex, LLC and Texion S. de R.L. de C.V., and in support thereof, would show the Court as follows:

### FACTUAL BACKGROUND

23.    In 2001, James Griffin, the president and, upon information and belief, principal owner, of Maquilaplex, approached representatives of IMR and asked if IMR would be interested in subcontracting sewing jobs to Maquilaplex, an industrial sewing business he had recently formed.

24. IMR had previously done business with Griffin's other company, DNC Warehouse Company. Nevertheless, IMR was hesitant to get involved with a start-up sewing venture. In response to IMR's expressed concerns, Griffin assured IMR that Maquilaplex could and would produce product suitable for the needs of IMR's customers and would do so at a very competitive price. Griffin also assured IMR that Maquilaplex had sufficient funds to meet all its operation and labor expenses and that any property, materials or equipment IMR provided to Maquilaplex or its subsidiary or associated factories would not be adversely affected by any work stoppage or labor issues.

25. In the fall of 2001, IMR entered into a contract to sew bags for Miller Bag Company ("Miller Bag"), a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Miller Bag was to then sell the bags to its customers, primarily including the Toro Company, a lawn equipment manufacturer based in Bloomington, Minnesota, for use in their manufacturing processes.

26. Miller Bag was an important new client for IMR. When the parties entered into the contract, it was anticipated that IMR would become Miller Bag's principal sewing manufacturer and that the relationship would continue to develop and grow over time.

27. In response to Griffin's request for sewing jobs, IMR began to subcontract with Maquilaplex to perform smaller sewing jobs associated with the Miller Bag contract. IMR eventually inquired whether Maquilaplex would be able to handle the sewing operations necessary to fulfill IMR's primary obligations to Miller Bag. IMR specifically and repeatedly informed Maquilaplex of the nature of the Miller Bag contract; of the particular needs of Miller Bag and its customers, including Toro; of the particular design and manufacture specifications of the products to be sewn; of the

particular production quantity and quality requirements for those products; and of the fact that the parties anticipated and were working towards the IMR-Miller Bag relationship to be a continuing, growing and significant business relationship.

28. In response to IMR's representations, Maquilaplex assured IMR that it could handle the Miller Bag project and could produce a sufficient quality and quantity of bags to meet the particular needs of IMR, Miller Bags', and Miller Bags' customers, including Toro. Maquilaplex also assured IMR that it had sufficient financial backing to meet all of its operation and labor expenses.

29. Based on Maquilaplex's assurances and representations, IMR entered into a contract with Maquilaplex. Under the contract, Maquilaplex agreed to sew bags to fulfill IMR's requirements to Miller Bag and its customers in consideration for payment of a predetermined price by IMR.

30. As part of the parties' contract, Maquilaplex warranted that the goods it produced would conform to the specifications provided by IMR and/or its customers; would be of good materials, workmanship and fabrications; would be free from defects; would be merchantable; and would be fit for the particular purpose for which they were purchased. Maquilaplex further warranted that all services provided under the contract would be performed in strict compliance with IMR's specifications, directions and requirements and in a workmanlike manner. Maquilaplex also warranted that it would be responsible for any damage or loss of any materials furnished to it by IMR or its customers.

31. IMR has abided by and fulfilled all of its obligations under the parties' contracts and agreements.

32. Contrary to its representations and assurances, and in breach of its obligations and warranties under the parties' contract, Maquilaplex did not perform the

services or produce the goods it had contracted with IMR to produce. Throughout the course of the parties' relationship. Maquilaplex failed to adequately and properly staff its factories, to train or supervise its personnel, or to implement necessary quality control and production practices that were requested and required by IMR. Maquilaplex failed to adhere to the instructions and specifications of IMR, failed to comply with cutting, sewing, and operational practices specifically agreed to by the parties and/or customary in the industry, frequently missed production levels and shipping dates agreed to by the parties, wasted and lost extensive quantities of raw material that had been supplied by IMR, and in produced and shipped product that was defective, not merchantable, unfit for the particular purpose for which IMR had purchased it and of inferior quality and workmanship.

33. IMR repeatedly demanded that Maquilaplex correct its production and quality control problems and offered advice, personnel and materials to assist Maquilaplex in that endeavor. Despite the IMR's efforts, however, Maquilaplex continued to miss shipping deadlines and production levels, to waste and lose substantial amounts of component material, and to manufacture and ship product that was unsuitable for the needs of IMR, Miller Bag or Miller Bag's customers.

34. In or around April 2002, James Griffin represented to IMR that due to a labor strike at the Mexican factory where the goods were being sewn, all of the sewing equipment and material that IMR had loaned to Maquilaplex to perform the sewing operations had to remain at the factory and was inaccessible until the labor dispute was resolved. IMR later learned that its material and equipment was not in the factory and that Maquilaplex had in fact moved it to a warehouse location and was keeping it hidden from IMR, presumably to prevent IMR from demanding the return of the equipment and canceling the contract due to Maquilaplex's non-performance. The

material and equipment was returned to IMR only after they threatened legal action against Maquilaplex. The unauthorized movement of the material and equipment did in fact cause great damage to material and equipment so that it had to be disposed of.

35. As a direct and proximate result of Maquilaplex's breaches, IMR was forced to inspect and rework a substantial amount of product that had been rejected by Miller Bag or its customers. 36. Also, as a direct and proximate result of Maquilaplex's breaches, Miller Bag terminated its contracts and all future business dealings with IMR.

37. In or around February 2002, Miller Bag informed IMR that it was terminating the parties' business relationship due to IMR's failure to meet the necessary production or quality levels.

38. As a direct and proximate result of Maquilaplex's breach of its contractual operations, IMR has incurred substantial direct, consequential and incidental damages including, without limit (i) over $220,000 in lost or wasted raw material; (ii) nearly $15,500 in defective product that was rejected by Miller Bag; (iii) over $10,000 in labor costs incurred by Miller for inspecting and reworking product that was rejected by Miller Bag or its customers; and (iv) substantial lost profits that IMR would have earned had Miller Bag not cancelled its contract with IMR due to Maquilaplex's inability to meet the production schedule or quality requirements.

39. IMR has demanded that Maquilaplex compensate it for these damages, but has received no response.

## COUNT I

### BREACH OF CONTRACT

40. Paragraphs 1 through 20 are incorporated by reference and realleged as though fully set forth herein.

41. In the fall of 2001, IMR and Maquilaplex entered into a contract, whereby Maquilaplex was to produce a sufficient level and quality of sewn bags to meet IMR's obligation to Miller Bags and its customers. In consideration, IMR agreed to pay, and Maquilaplex agreed to accept, a predetermined amount of money for its efforts.

42. In breach of its express and implied contractual obligations and warranties, Maquilaplex failed to utilize agreed to inventory, cutting, sewing and/or finishing procedures, resulting in the waste or loss of substantial raw material provided by IMR. In breach of its express and implied contractual obligations, Maquilaplex also failed to maintain agreed to quality control measures; failed to properly train or supervise its staff or maintain qualified laborers and supervisors; failed to meet agreed to shipping dates or production levels; and produced product that was defective, not merchantable, unfit for the particular purpose for which IMR had purchased it and of inferior quality and workmanship.

43. As a direct and proximate result of Maquilaplex's breach of its contractual obligations, IMR has incurred substantial direct, incidental and consequential damages in an amount to be proven at trial, but which is reasonably believed to exceed $50,000.

## COUNT TWO

### CONVERSION

44. Paragraphs 1 through 24 are incorporated by reference and realleged as though fully set forth herein.

45. During the course of the parties' contractual relationship, IMR sent fabric and component parts/materials to Maquilaplex's factories for Maquilaplex to utilize in cutting and sewing the product in accordance with the parties' contract. IMR specifically instructed Maquilaplex as to the permissible and proper uses for that fabric

and component parts and did not authorize or consent to any other use of the fabric or component parts.

46.   At all times relevant to this action, IMR was the owner and held all rights to the fabric and component parts it furnished to Maquilaplex.

47.   During the course of the parties' relationship and while in possession of the fabric, Maquilaplex converted the fabric and component parts to its own use by engaging in unauthorized acts that resulted in the loss, destruction and/or waste of substantial amounts of fabric and component parts.

48.   Maquilaplex's conversion of the fabric and component parts has directly and proximately caused IMR to suffer damages in an amount to be proven at trial, but which are reasonably believed to exceed $50,000.

WHEREFORE, Defendant International Marketing Resources, Inc. prays that upon final trial and hearing hereof, it have judgment in accordance with the law and facts as found by this Honorable Court and Jury, that it be awarded all dirct consequential and incidental damages caused by Counter-Defendants, plus interest thereon, its reasonable costs and attorney's fees to the extent permitted by law, and for such other and further relief, legal or equitable, general or special, to which it may show itself justly entitled to receive.

Respectfully submitted,

RODRIGUEZ, COLVIN & CHANEY, L.L.P.

By: _____
Alison D. Kennamer
Attorney-in-Charge
State Bar No. 11280400
Southern District Admissions No. 12023
1201 East Van Buren
P.O. Box 2155
Brownsville, Texas 78522
(956) 542-7441
Fax (956) 541-2170

OF COUNSEL:
Steven D. Kelley
Minn. Bar No. 229726
Christopher L. Lynch
Minn. Bar No. 284154
LINDQUEST & VENNUM, PLLP
4200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402-2205
(612) 371-3211
Fax (612) 371-3207

**ATTORNEYS FOR DEFENDANT, INTERNATIONAL MARKETING RESOURCES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant International Marketing Resources, Inc.'s Original Answer, Jury Demand, and Counterclaim was served upon all counsel of record, to-wit:

>Samuel S. Griffin III
>W. Michael Taylor
>Griffin & Matthews
>1155 Dairy Ashford, Suite 300
>Houston, Texas 77079
>Attorneys for Plaintiffs

by certified mail, return receipt requested, facsimile transmission, and/or hand delivery pursuant to the Texas Rules of Civil Procedure on this the 20th day of December, 2002.

_____
Alison D. Kennamer

# VERIFICATION

STATE OF MINNESOTA *
COUNTY OF Hennepin *

On this day Jack Spillane, President of International Marketing Resources, Inc., personally appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said that he has read Defendant International Marketing Resources, Inc.'s Original Answer, Jury Demand, and Counterclaim, the facts contained in Paragraph 6 are within his personal knowledge and are true and correct.

JACK SPILLANE, President
International Marketing Resources, Inc.

SWORN TO AND SUBSCRIBED BEFORE ME, on this the 19th day of December, 2002, to certify which witness my hand and seal of authority.

Notary Public in and for the State of Minnesota



BETHANIE P. HOWARD
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan 31, 2005